UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY ROSS, Ph.D.,

      Plaintiff,                                     Case No. 1:10-cv-216

v.                                                   HON. JANET T. NEFF

MICHIGAN STATE UNIVERSITY
BOARD OF REGENTS and
MICHIGAN STATE UNIVERSITY
BOARD OF TRUSTEES,

      Defendants.
_____/

## OPINION

Plaintiff, an African-American, filed this action alleging violations of his civil rights under Title VI, 42 U.S.C. § 2000d, stemming from discrimination and retaliation he allegedly suffered while employed as an Associate Professor of Logistics in the Supply Chain Management Department at Michigan State University (MSU) (Pl. Compl., Dkt 1).[1] The First Amended Complaint, filed March 12, 2010, alleges three violations of 42 U.S.C. § 2000d: Count 1, race discrimination; Count 2, retaliation; and Count 3, hostile working environment (*id.*).

The matter is currently before the Court on Defendant's Motion to Dismiss (Dkts 20, 21). Plaintiff has filed a Response (Dkt 22), and Defendant has filed a Reply (Dkt 23). This motion is being decided without oral argument. *See* W.D. Mich. LCivR 7.2(d). After careful consideration of the parties' arguments and applicable law, the Court grants Defendant's Motion to Dismiss.

---

[1] Plaintiff's Complaint named the Michigan State University Board of Regents as the defendant. On Plaintiff's motion, the Board of Regents has since been dismissed as a defendant (Dkt 3, 4) and Plaintiff's First Amended Complaint names the Michigan State University Board of Trustees as the sole defendant in the case (Dkt 2).

I. BACKGROUND

Plaintiff has been employed by Michigan State University as an Associate Professor in the Supply Chain Management Department since 2000 and has been a part of the Logistics Department, a division of the Supply Chain Management Department, since 2003 (Dkt 2 ¶¶ 1, 11-12). As of October 10, 2009, Plaintiff had written fifteen research articles and had been with MSU for nine years (*id.* ¶¶ 47-48). Plaintiff received tenure from MSU in 2002 (*id.* ¶ 48).

Plaintiff's claims of discrimination and hostile work environment arise from the allegedly discriminatory actions of Dr. David Closs, the sole full professor in the Logistics Department since mid-2006 and the department chairperson since mid-2007 (Dkt 2 ¶¶ 18-19, 27-28, 35, 38). Dr. Closs allegedly "had authority to assign, or refuse to assign, Plaintiff to teaching assignments and other career advancement opportunities" and "had substantial authority to approve or deny Plaintiff's requests for promotion within the program" (*id.* ¶¶ 27-28). Plaintiff alleges that Dr. Closs, on two occasions, told Plaintiff that he was given a counter-offer or retained at MSU because he was black (*id.* ¶¶ 39, 62, 74).[2] Plaintiff also alleges that, "in accordance with [this] blatant bigotry," Dr. Closs (1) "consistently directed resources, teaching opportunities, and opportunities for national academic exposure away from [Plaintiff] and to similarly situated professors who were of a race [Dr. Closs] found to be more favorable" and (2) "wrongfully blocked Plaintiff's 2008 bid for promotion" (*id.* ¶ 1). Program leadership roles, preferential teaching assignments, and opportunities to work with doctoral students were provided to "professors of non-African descent with inferior qualifications" (*id.* ¶ 43). Plaintiff further contends that he was given an undesirable and time-consuming work

---

[2]Plaintiff alleges that Dr. Closs made these comments in September of 2005 (*id.* ¶ 62) and again in September of 2008 (*id.* ¶¶ 62, 74).

assignment in 2003 in "an attempt to steer him in a direction counterproductive to his obtaining promotion to full professor" (*id.* ¶ 32).

Plaintiff specifically identifies three professors as having received preferential work assignments:[3] (1) Dr. Whipple, an associate professor who had been at MSU for eleven years (three of which were in Supply Chain Management), had published five research articles, and had been given tenure in 1998 (*id.* ¶¶ 47-48); (2) Dr. Edward Morash, an associate professor who had been at MSU for twenty-five years (*id.* ¶ 52-53); and (3) Dr. Bixby Cooper (*id.* ¶ 54). Plaintiff asserts that both Dr. Morash and Dr. Cooper have "inferior research record[s] to Plaintiff" and are "un-promotable" because the academic community considers a professor to be "un-promotable" if he "fails to achieve a level of achievement and be promoted from Associate Professor after 25 years" (*id.* ¶¶ 51-52, 54).

Plaintiff also alleges that Dr. Closs discriminated against him by criticizing his performance on two occasions. The first was allegedly the result of "a decrease in [his] normally above average involvement in the program" caused by his infant daughter's heart problems and need for critical care from 2002 through 2005 (Dkt 2 ¶¶ 57-58). Plaintiff alleges that Dr. Closs "seized upon this opportunity and sanctioned Plaintiff with a harsh letter of criticism which he later used to justify his inequitable allocation of the opportunities within the program" (*id.* ¶ 58). Plaintiff contends that Dr. Morgan Swink, "a similarly situated associate professor within the program" who had a child battling leukemia, was promoted to full professor in 2006 despite having "encountered a long period of low research output as a result" of his child's illness (*id.* ¶¶ 59-61).

---

[3]Plaintiff also alleges that additional Logistics teaching assignments were given to Dr. Jeff Tew in the Fall of 2006 (*id.* ¶ 33), but provides no additional information or allegations relating to Dr. Tew.

Plaintiff alleges that Dr. Closs again criticized him in the summer of 2009, after he was given the task of coordinating the Logistics PhD Comprehensive Examination. Plaintiff alleges that he was not provided with a new version of the program manual and, as a result, he was "berated . . . in a one on one meeting" by Dr. Closs because the examination "was not within the specifications of the program manual" (*id.* ¶¶ 82-85). Plaintiff contends that "the program manual had been altered by . . . Closs and/or Whipple and the new requirements were intentionally concealed from him" (*id.* ¶ 86).

Plaintiff's claims also rest on his unsuccessful bids for promotion to full professor. Plaintiff alleges that in October of 2007, the former Department Chairperson and the Associate Dean for Academic Affairs and Research both indicated to Plaintiff that "his record was sufficient for promotion" (*id.* ¶¶ 35-36). Plaintiff contends that, in reliance on these statements, he "made a bid for promotion" in 2007 to Dr. Closs, who "failed to timely respond," thereby forcing Plaintiff to wait until 2008 to bid for promotion to full professor (*id.* ¶¶ 69-70). As part of his bid for promotion, Plaintiff went through an external review process, in which he was criticized for failing to interact with graduate students (*id.* ¶¶ 77, 79). Plaintiff alleges that "[h]e was subsequently refused promotion in light of this unfavorable external review" and that the unfavorable review was "directly attributable to [Dr.] Closs's six year refusal to promote him to doctoral teaching positions in favor of less qualified applicants" (*id.* ¶¶ 80-81).

Plaintiff acknowledges that he was made Director of the Logistics Doctoral Program in August 2007, a change that he characterizes as "a different title for the work he was doing" (*id.* ¶ 67-68). However, Plaintiff asserts that "the language shift was in no way a 'promotion' by any meaningful definition of the term" and that he "still received the same pay scale, held the same title,

and was on the same level of seniority as before" (*id.* ¶ 68). Plaintiff alleges that he "voluntarily resigned as Director of the Logistics Doctoral Program after an argument with Dr. Closs" in September 2009 (*id.* ¶ 91). He claims that his resignation constitutes a constructive discharge that resulted from "the overwhelming favoritism of Dr. Whipple and the overall harassment and racism of Dr. Closs" (*id.* ¶ 91). Plaintiff continues to be employed as an Associate Professor at MSU (*id.* ¶ 95).

Plaintiff also claims that MSU retaliated against him for making complaints about Dr. Closs's behavior. Plaintiff alleges that after a meeting to discuss the problems between Dr. Closs and Plaintiff in October 2008, Plaintiff's application for promotion was denied (*id.* ¶¶ 92, 109-110). Plaintiff alleges that, at his request, another meeting was held in September of 2009, after which the Interim Dean issued a memorandum inaccurately stating "that the racial tensions between Plaintiff and Dr. Closs had been satisfactorily resolved, and that other factors had been determined as the true cause of the refusal to promote Plaintiff within the program and allocate resources to him" (*id.* ¶¶ 93-94). Plaintiff asserts that he "was again denied his bid for promotion" and that the denial was "in whole or in part, due to his voicing his complaints about the bigoted statements and attitudes of Dr. Closs" (*id.* ¶¶ 113-114).

## II.  ANALYSIS

### A.  Standard of Review

When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept well-pleaded allegations of the complaint as true and all allegations must be construed in the light most favorable to Plaintiff. *Bower v. Fed. Exp. Corp.*, 96 F.3d 200, 203 (6th Cir. 1996). As the Supreme Court stated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a motion

to dismiss will be denied only where the "[f]actual allegations [are] enough to raise a right for relief above the speculative level" "on the assumption that all of the complaint's allegations are true . . . ." *Id.* at 545. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility . . . .'" *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 556-57). Making a determination of plausibility "is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949.

### B. Title VI Racial Discrimination

Title VI prohibits discrimination "on the ground of race, color, or national origin" in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. A Title VI claim requires a plaintiff to allege intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001). "[T]o avoid summary judgment on a claim under § 2000d, a plaintiff must create a genuine issue of material fact that the defendant intended to discriminate on the basis of race." *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1356 (6th Cir. 1996).

To establish a discrimination claim under Title VI, Plaintiff must show either direct evidence of racial discrimination or establish a prima facie showing of discrimination. *Paasewe v. Ohio Arts*

*Council*, 74 F. App'x 505, 507 (6th Cir. 2003) (citing *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356 (6th Cir. 1996)); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Both parties to this action have addressed the claim as requiring a prima facie showing of discrimination (*see* Dkt 21 at 10; Dkt 22 at 7). A prima facie case of employment discrimination requires a plaintiff to demonstrate that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse action; and (4) a causal connection between the plaintiff's protected status and the adverse action." *Caulker v. Mich. State Univ.*, No. 1:09-cv-125, 2009 WL 3644778, at *5 & n.3 (W.D. Mich. Nov. 2, 2009) (citation omitted) (presuming the *McDonnell Dougla*s burden-shifting framework applies to Title VI claims).

An adverse employment action is "'a materially adverse change in the terms and conditions of employment because of the employer's actions.'" *Steward v. New Chrysler*, 415 Fed. Appx 632, 640 (6th Cir. 2011) (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 548, 593 (6th Cir. 2007) (citation omitted). As the *Steward* decision reiterated:

> [a] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Id.* (quoting *Michael*, 496 F.3d at 594) (citations omitted). *See also Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (citation omitted) (noting that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions").

The Sixth Circuit Court of Appeals has recognized a failure to promote as an adverse employment action in the context of a Title VII claim. *Nguyen v. City of Cleveland*, 229 F.3d 559,

562-63 (6th Cir. 2000).[4] However, "[i]n order to establish a *prima facie* case of racial discrimination based upon a failure to promote, the plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion, (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied. *Id.* (citing *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1095 (6th Cir. 1996); *Brown v. Tennessee,* 693 F.2d 600, 603 (6th Cir. 1982).

After reviewing the Amended Complaint in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to allege facts sufficient to establish a claim of racial discrimination. Plaintiff's allegation that he was denied promotion to full professor fails to establish a cognizable discrimination claim.

Plaintiff has failed to allege facts sufficient to show that other similarly situated employees received promotions at the time that Plaintiff's request was denied. Plaintiff's only allegation in this regard relates to Dr. Morgan Swink. Plaintiff makes the conclusory statement that Dr. Swink was "a similarly situated associate professor within the program" (Dkt 2 ¶ 59) without providing any factual allegations to support this conclusion. Plaintiff then asserts that Dr. Swink was promoted to full professor in 2006 in the operations and sourcing subgroup (*id.* ¶ 61). Plaintiff does not, however, allege that Plaintiff was denied promotion in 2006 or even that he applied for promotion in 2006. Further, Plaintiff makes no allegation that other similarly situated professors were promoted in either 2007, when he alleges that Dr. Closs blocked his bid for promotion, or in the

---

[4] Although Plaintiff relies on *Nguyen*, which involved a Title VII claim, the Court will assume for purposes of analysis, that these principles apply equally to a Title VI "failure to promote" claim.

period from October of 2008 until September of 2009, when he alleges that his bid for promotion was denied. Indeed, Plaintiff does not allege that anyone else in his department was promoted to full professor while his bid was pending. Rather, his allegations indicate that there were at least three professors in the department who were not members of Plaintiff's protected class, had been at MSU longer than Plaintiff, and had not been promoted to full professor.[5] As a result, Plaintiff has failed to establish that other employees with similar qualifications were promoted when he was not. With regard to Plaintiff's assertion that he was denied resources, preferred teaching opportunities, and national exposure, those allegations are insufficient to cure the shortcomings in Plaintiff's failure to promote claim. Plaintiff has not otherwise shown an adverse employment action to establish a *prima facie* case of discrimination.

Plaintiff's claim of constructive discharge is similarly unpersuasive. "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). Constructive discharge is established if "'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982) (quoting *Bourque v. Powell Electric Mfg.*, 617 F.2d 61, 65 (5th Cir. 1980). Plaintiff continues to be employed by MSU (Dkt 2 ¶ 95). His claim of constructive discharge arises from his voluntary resignation as Director of the

---

[5]Plaintiff identifies Dr. Morash, Dr. Cooper, and Dr. Whipple in this category. Plaintiff alleges that Dr. Edward Morash had failed to gain promotion to full professor in 25 years was thus "un-promotable," as was Dr. Bixby Cooper (*see id.* ¶¶ 49, 51-54). Plaintiff alleged that he and Dr. Whipple were similarly situated, but acknowledges that Dr. Whipple has been at MSU for two years longer than Plaintiff and received tenure four years before Plaintiff (*see id.* ¶¶ 45, 47-48).

Logistics Doctoral Program (*id.* ¶ 91).  Plaintiff does not allege, however, that his resignation was necessitated by a need to escape from intolerable working conditions or that the resignation accomplished any such goal.  Rather, Plaintiff alleges that his appointment to the Director position was simply "a different title for the work he was doing" (*id.* ¶ 68).  After his resignation, Plaintiff continued to work in the Logistics Department with Dr. Closs and received no decrease in pay or seniority.

Because Plaintiff has failed to allege facts sufficient to establish that he suffered a materially adverse change in the terms or conditions of his employment as the result of his race, the Court finds that Plaintiff has failed to state a cognizable racial discrimination claim.

### B.  Retaliation

Plaintiff does not allege direct evidence of retaliation.  To establish prima facie claim of retaliation, Plaintiff must show that (1) he engaged in activity that is protected by Title VI; (2) MSU knew of the protected activity; (3) MSU took a materially adverse action against Plaintiff or subjected him "to severe and pervasive retaliatory harassment"; and (4) "there was a causal connection between the protected activity and the materially adverse action."  *Moberly v. Univ. of Cincinnati Clermont Coll.*, No. 1:08-cv-569, 2010 WL 3489029, at *5 (S.D. Ohio Feb. 1, 2010) (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007)).

The definition of adverse employment action applicable to claims of discrimination also applies in the context of retaliation claims.  *See White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 799 (6th Cir. 2004).  For the reasons discussed above, the Court finds that Plaintiff has failed to allege facts sufficient to establish that he suffered an adverse employment action.  Plaintiff has also failed to make any factual allegations of a causal connection between his meetings

with MSU administration representatives and denial of his bid for promotion (Dkt 2 ¶¶ 109-14). At most, Plaintiff has alleged a bare-bones chronology of events and a conclusory opinion. As a result, Plaintiff has failed to state a retaliation claim.

### C. Hostile Working Environment

A hostile environment claim under Title VI allows a plaintiff to maintain an action when the recipient of federal funds fails to address a racially hostile environment. Plaintiffs must demonstrate "'severe, pervasive, and objectively offensive'" harassment and a response that is "'clearly unreasonable in light of the known circumstances.'" *Whitfield v. Notre Dame Middle Sch.*, 412 Fed. App'x 517, 521-22 (3d Cir. 2011) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633, 648-49 (1999)). In making a determination as to whether a hostile working environment has been established, the Court evaluates all of the surrounding circumstances, including (1) the frequency and severity of the discriminatory conduct; (2) whether the conduct threatened physical harm or humiliation, or was merely an offensive remark; and (3) whether the conduct "'unreasonably interferes with an employee's work performance.'" *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

Plaintiff's allegations do not establish that he suffered from the severe, pervasive, and objectively offensive harassment necessary to state a hostile working environment claim. Plaintiff's hostile work environment claim alleges that Dr. Closs made comments relating to Plaintiff's race, (2) Plaintiff resigned as Director of Logistics Department as a result, and (3) MSU, through Acting Dean Lashbrooke, was aware of and excused the conduct (Dkt 2 ¶¶ 115-23).

These allegations are insufficient to sustain a hostile working environment claim. The two comments made by Dr. Closs, although offensive to Plaintiff, occurred three years apart and did not

involve intimidation or threats of physical harm. *See Torres v. Cnty. of Oakland*, 758 F.2d 147, 152 (6th Cir. 1985) (finding that "a continuing use of racial or ethnic slurs" creates a hostile environment, but "occasional or sporadic instances of such conduct does not"). The alleged critical evaluations by Dr. Closs did not result in changes to Plaintiff's pay or terms of employment and neither involved public humiliation of Plaintiff. Moreover, as discussed above, Plaintiff's resignation was voluntary, occurred a year after the second alleged racial remark, and does not establish the elements of a constructive discharge.

Further, Plaintiff's claim acknowledges that representatives of the MSU administration held two meetings to discuss the problems between Plaintiff and Dr. Closs (Dkt 2 ¶¶ 92-94, 109, 111, 120-22). The Interim Dean, Assistant Dean and Associate Provost for Academic Human Resources participated in these meetings and a memorandum was issued by the Interim Dean summarizing the results of the last meeting, which Plaintiff calls an alibi letter (*id.,* ¶ 122), but does not include in his pleadings. In light of the circumstances, as factually alleged and as analyzed above, the response by MSU was not clearly unreasonable.

For these reasons, the Court finds that Plaintiff has failed to state a hostile working environment claim.

### III.  CONCLUSION

For the foregoing reasons, the Court determines that Defendant's Motion to Dismiss (Dkt 20) is granted. An Order and Judgment will be entered consistent with this Opinion.

DATED: September 12, 2011          /s/ Janet T. Neff
                                   JANET T. NEFF
                                   United States District Judge